**METRIC CONSTRUCTORS, INC. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–72C, 96–73C.**

United States Court of Federal Claims.

Aug. 5, 1999.

Steven E. Sanders, Baton Rouge, LA, for plaintiff.

Monica J. Palko, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Joseph A. Kijewski, Assistant Director, U.S. Department of Justice, Washington, DC for defendant. Dudley R. Cannon, Jr., Associate Counsel, National Aeronautics and Space Administration, John F. Kennedy Space Center, FL, of counsel.

## OPINION

HEWITT, Judge.

Plaintiff, Metric Constructors ("Metric"), seeks to recover expenses it incurred while completing work on the plumbing and air ventilation systems of the Kennedy Space Center ("KSC") Space Station Processing Facility ("SSPF")[1] under a contract with the National Aeronautics and Space Administration ("NASA"). Metric alleges that the Contracting Officer ("CO") required Metric to insulate the heat pumps in the plumbing system ("heat pumps") and the flexible ductwork in the air ventilation system ("flexible ductwork") even though there was no contractual requirement to insulate either the heat pumps or the flexible ductwork. Metric also alleges that it was instructed by NASA technical advisors not to insulate the flexible ductwork and then was later directed by the CO to remobilize workers, at additional cost, to insulate the flexible ductwork. Finally, Metric claims that the contract was defective

---

1. The SSPF "consists of approximately 500,000 square feet and contains offices, computer and communications facilities, clean rooms, [and] bays for processing space station payloads." *See* *Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 748 (Fed.Cir. 1999).

because it did not specify how to insulate the flexible ductwork.

Defendant, the United States (the "government" or "NASA"), seeks summary judgment under Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC") on the grounds that the language of the contract required Metric to insulate the heat pumps and the flexible ductwork and that NASA's technical representatives were unauthorized to instruct Metric not to insulate the flexible ductwork. Metric also seeks summary judgment by cross-motion.

As explained below, the court lacks subject matter jurisdiction over Metric's claim that the contract was defective. Metric's claims that the language of the contract did not require insulation of the heat pumps or of the flexible ductwork, and its claim regarding the instruction from the NASA technical advisors, however, are within the court's jurisdiction. In its response to the government's motion for summary judgment, Metric conceded that the NASA technical advisors did not have the authority to instruct Metric not to insulate the flexible ductwork. Plaintiff's Response ("Pl.'s Response") at 10. The remaining issues are whether the contract required either insulation of the heat pumps or insulation of the flexible ductwork. For the following reasons, the government's motion is GRANTED with respect to the insulation of the heat pumps and DENIED with respect to the flexible ductwork. Metric's cross-motion is DENIED in its entirety.

## I. Background

### A. The Heat Pumps

The facts in this case are undisputed by the parties.[2] On February 15, 1991, the government awarded Contract No. NAS10–

11800 to Metric based upon a sealed bid totaling $56,215,000.00. The work required under the contract included the construction of the KSC SSPF.

Requirements for the insulation of pumps in the heated and chilled water systems were included in the contract in section 15260 in four separate paragraphs.[3] The first paragraph described the requirement to insulate different parts of the plumbing system. The second paragraph listed which of the separate systems within the plumbing system required insulation; included was the heated and chilled water equipment system. The third paragraph described the specifications for insulation of the heated and chilled water equipment system; pumps were included among the equipment to be insulated. The fourth paragraph dealt with the type of insulation required and the procedure for its installation.

A dispute arose between Metric and the government concerning whether or not the heat pumps in the plumbing system were required to be insulated under the language of the contract. Metric sent a request for information to the CO in which it stated its position that only the chilled water pumps required insulation or, alternatively, that the heat pumps could not be insulated with the type of insulation specified if Metric was to comply with the contract's requirement to leave the heat pumps accessible for repair. The CO responded that insulation of the heat pumps was required under the language of the contract and that a change order would not be issued.[4] The CO suggested that Metric submit a deviation waiver for any change it wished to make regarding the type of

---

2. Facts are taken from the government's proposed findings of uncontroverted fact, the contents of which Metric has adopted in its proposed findings of uncontroverted fact with the exception of footnote 2 to finding 30. The contents of footnote 2 are not material to this case. The court also relies on provisions of the contract found in the appendix to the government's motion for summary judgment, the contents of which are adopted in Metric's proposed findings of uncontroverted fact. Facts not taken from one of those sources are cited specifically.

3. The specific language of these contract provisions is set out in section III. C below. The four relevant paragraphs are in contract section 15260 at ¶¶ 1.1, 1.3, 1.3.5, and 3.1.5.

4. The FAR "Changes" clause was incorporated into the contract in section VII. See 48 C.F.R. § 52.243–4 (1998); Def.'s Motion at A19. The CO did not issue a change order with regard to the heat pump insulation because, in the CO's view, the insulation was always a requirement of the contract. Def.'s Motion at A105, A108.

insulation.[5] Metric submitted a deviation waiver to change the type of insulation. Metric also sent a letter to the CO stating that it would complete the insulation of the heat pumps but protesting the CO's denial of a change order and restating its belief that insulation of the heat pumps was not required under the contract. After installing the insulation for the heat pumps Metric submitted a claim to the CO for $13,514.00.

## B. The Flexible Ductwork

Requirements for insulation of the ductwork in the air ventilation system were included in the contract in section 15258 in two separate paragraphs.[6] The first paragraph listed the specific parts of the air ductwork system to be insulated and the type of insulation to be used, including areas where flexible ductwork was used.[7] The second paragraph described the type of insulation specified and the requirements for its installation. The type of insulation specified was a rigid type "T–13;" the specifications noted that T–13 was for sheet metal surfaces. The parties agree that the flexible ductwork was not made of sheet metal.[8]

On April 27, 1993, Metric met with a group of NASA's technical representatives (a group which did not include the CO) and requested a clarification of whether the flexible ductwork required insulation. Metric was advised that the flexible ductwork did not need to be insulated. During two meetings with NASA's technical representatives that took place on September 2, 1993, Metric was informed that it was required to insulate the

flexible ductwork. On October 7, 1993, Metric contacted the CO for the first time regarding the flexible ductwork to request a change order to compensate for the added labor costs that it would have to incur in order to send workers back on the job to insulate the flexible ductwork. The CO denied the change order and told Metric that the insulation had always been a requirement of the contract. Metric then submitted a letter to the CO requesting a change order or the CO's specific direction on how to insulate the flexible ductwork because Metric believed that the "T–13" rigid type of insulation required for the outside air and supply air ductwork would be impossible to install on the flexible ductwork. The CO denied the change order on the basis of the language of the contract. The CO also stated that, notwithstanding that the meeting between Metric and NASA's representatives on April 27, 1993 had concluded that the insulation could be omitted, the insulation had remained a contractual requirement. Metric then submitted a certified claim to the CO for $66,082.00 for the cost of insulating the flexible ductwork.

The CO denied Metric's claim regarding the insulation of the heat pumps and its claim regarding insulation of the flexible ductwork. Metric appealed the CO's decisions to this court.

## C. Proceedings In This Court

This case originally came before the court in two separate suits—No. 96–72C, regard-

---

5. Under Article 4 section 52.210–91, the contract required the contractor to submit a written deviation or waiver request to the CO for approval prior to performing any work that did not conform to the specifications of the contract. Def.'s Motion at A6.

6. The specific language of all contract provisions is addressed in the discussion section. The two relevant paragraphs regarding insulation of the air ventilation system are found in section 15258 at ¶¶ 1.3 and 3.1.2 respectively. Def.'s Motion at A30, A33–34.

7. Flexible ductwork was used in the outside air supply ductwork referred to in section 15258 ¶ 1.3. Def.'s Motion at A116 (listing CO's determination of relevant contract provisions regarding flexible ductwork).

8. Two sections in the contract specified that the flexible ductwork was made of a fiberglass material, rather than sheet metal.

Section 15841, entitled "LOW PRESSURE DUCTWORK/HUMIDIFIERS," ¶ 2.4, "Flexible Duct Materials," stated in pertinent part, "Wire-reinforced *fibrous-glass duct* shall consist of a minimum 1–pound–density fibrous glass bonded to and supported by corrosion-protected spring helix.... Thermal conductivity shall be not greater than 0.23 at 75 degrees F mean." Def.'s Motion at A59 (emphasis added). Section 15841 ¶ 2.8, "Flexible Connectors for Sheet Metal," provided, "Connectors shall be UL-listed, 20–ounce, fire-retardant, airtight, *woven fiberous-glass cloth* impregnated with chloroprene." Def.'s Motion at A61 (emphasis added).

ing the heat pumps, and No. 96–73C, regarding the flexible ductwork. Both complaints were filed on February 8, 1996. The cases were consolidated by an order dated October 23, 1996. *See* 41 U.S.C. § 609(d) (1994). The government filed its Proposed Findings of Uncontroverted Fact ("Def.'s Facts") along with its motion for summary judgment on January 31, 1997. Metric filed its response to defendant's motion and a cross-motion for summary judgment on January 14, 1998, along with its Proposed Findings of Uncontroverted Fact ("Pl.'s Facts") and Statement of Genuine Issues. The government filed its response to Metric's cross-motion on July 20, 1998.

## II. Jurisdiction

The Supreme Court recently restated in *Steel Co. v. Citizens for a Better Environment* that determining whether subject matter jurisdiction exists is an "inflexible" threshold matter. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Mansfield C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)); *see also Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 89 (1989) (citing *Hambsch v. United States*, 857 F.2d 763, 765 (Fed.Cir.1988)). Accordingly, this court addresses the jurisdiction issue first.

 Metric's contention that the contract is technically defective falls outside of this court's jurisdiction because it has not yet been submitted to the CO for a final decision as required by 41 U.S.C. § 605(a).[9] The law is well settled that disputes brought to the court under the Contract Disputes Act ("CDA") must be submitted in writing to the contracting officer. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed.Cir.1987); *see also Orbas & Assoc. v. United States*, 34 Fed.Cl. 68, 70 (1995) (denying recovery for contractor because claim was different than that submitted to contracting officer and thus lacked the required final decision); *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84 (1989) (denying

contractor recovery because claim was different than that submitted to contracting officer and thus lacked required submissal). The CDA does not require the contractor to submit a claim in any particular form or wording. " 'All that is required is that the contractor submit in writing a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.' " *Orbas*, 34 Fed.Cl. at 70 (quoting *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987)).

 The contractor has the right on appeal to the Board or in direct action in this court to increase the amount of his claim; but the contractor may not raise any new claims not presented to the contracting officer. *See Santa Fe*, 818 F.2d at 858; *AAI Corp. v. United States*, 22 Cl.Ct. 541, 544 (1991). A new claim is one that does not arise from the same set of operative facts as the claim submitted to the contracting officer. *See Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed.Cir.1984); *SMS Data Products Group, Inc. v. United States*, 19 Cl.Ct. 612, 615–16 (1990) (citing *Glenn v. United States*, 858 F.2d 1577, 1580 (Fed.Cir. 1988)); *see also Foley Co. v. United States*, 26 Cl.Ct. 936, 940 (1992), *aff'd* 11 F.3d 1032 (Fed.Cir.1993); *AAI Corp.*, 22 Cl.Ct. at 545; *Spirit Leveling*, 19 Cl.Ct. at 91. A claim cannot be said to arise from the same set of operative facts if adjudication of the claim by the court would "circumvent[ ] the statutory role of the contracting officer to receive and pass judgment on the contractor's entire claim." *Laidlaw Envtl. Serv., Inc. v. United States*, 43 Fed.Cl. 44, 49–50 (1999) (quoting *Cerberonics v. United States*, 13 Cl.Ct. 415, 417 (1987)).

 The Court of Federal Claims examined this requirement in *Orbas & Assoc. v. United States*, 34 Fed.Cl. 68 (1995), where the contractor requested recovery of additional costs for insulating a building for the Navy. The contractor's original complaint to the contracting officer alleged that the con-

---

9. Under 41 U.S.C. § 605(a), "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (1994).

tracting officer directed it to install insulation that was not required under the contract. *See Orbas,* 34 Fed.Cl. at 69. The contracting officer denied the contractor's claim in its entirety and the contractor appealed to the Court of Federal Claims. *See id.* at 71. The contractor then moved for summary judgment and "clarified" its original claim by alleging that defendant unreasonably interpreted the contract by requiring a different type of insulation than that specified in the contract. *See id.* The Court of Federal Claims held that "[b]ecause Orbas 'did not submit to the contracting officer a clear and unequivocal' claim for the ... alternative [insulation], this court is without jurisdiction to decide that claim." *Id.* at 70. The basis for the court's decision was that the "[p]laintiff never afforded the contracting officer adequate notice" about its new dispute under the contract. *See id.*

A similar analysis applies to Metric's claim that the specifications of the contract were defective. The original claim that Metric submitted to the CO focused on instructions to Metric from the NASA technical advisors.[10] The claim stated, "Metric's basis for this claim is that we were directed by NASA to not insulate the flex connectors, then, after all the ductwork insulation was completed, we were redirected to insulate the flex connections with revised, more costly, materials and methods." Def.'s Motion at A111. A new claim, submitted to this court for the first time in Metric's response[11], deals with whether the specifications of the contract were unworkable. It stated, "[T]here is no portion of the technical specifications addressing *how, or what type of,* insulation is to be applied to the flexible connections." Pl.'s Response at 8 (emphasis added). Neither the plain language of the original claim to the CO, nor the response to that claim by the CO, suggests anything about technically defective specifications. We conclude that Metric's defective specifications claim does not

arise from the same set of operative facts as its claim regarding the instruction from the technical advisors and that it has not been submitted to the CO as required for this court to exercise jurisdiction. The defective specifications claim was neither raised by, nor was an evaluation of the specifications necessary to, the CO's final decision on the claim regarding the instruction from the technical advisors.

■ While Metric's original claim regarding the technical advisors' instruction did not include a claim for defective contract specifications, it did encompass Metric's claim that insulation of the flexible ductwork was not required under the contract. In her final decision on Metric's claim regarding the instruction from the technical advisors, the CO discussed, out of necessity, whether the contract required insulation of the flexible ductwork. Def.'s Motion at A124. The CO could not have decided whether the instruction from the technical advisors not to insulate the flexible ductwork was within their authority without first determining if insulation of the flexible ductwork was required under the contract. Because it was necessary for the CO to decide whether the contract required insulation of the flexible ductwork in order to decide the claim regarding the authority of the technical advisors, both claims arise from the same set of operative facts and fall within the court's jurisdiction under 41 U.S.C. § 605.

III. Discussion

A. Summary Judgment is Appropriate in this Case

Rule 56(c) of the RCFC permits summary judgment when "no genuine issue as to any material fact" exists and when "the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505,

---

10. As discussed above at note 2, the aspect of Metric's claim regarding whether the technical advisors could vary the contract does not require further discussion because Metric conceded in its response that the NASA technical advisors were not authorized to instruct Metric not to insulate the flexible ductwork. Pl.'s Response at 10.

11. In fact, neither Metric's claim regarding defective specifications nor its claim that the contract did not require insulation of the flexible ductwork came before this court in Metric's complaint; both were introduced in Metric's response and cross-motion to defendant's motion for summary judgment.

91 L.Ed.2d 202 (1986). A material fact is one that is effectual in establishing or defending against a claim and that may affect the outcome of the decision. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1449 (Fed.Cir.1993). An issue is genuine if a reasonable finder of fact could find in favor of the nonmoving party. *See id.* There are no disputed issues as to any material fact in this case and both parties agree to the facts as stipulated in the government's proposed findings of uncontroverted facts. In addition, the remaining issues in the case are questions of contract interpretation and thus are questions of law particularly suited to resolution by summary judgment. *See Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed.Cir.1995).

### B. Contract Interpretation

▓▓ When parties to a contract dispute the meaning of their agreement, the court must examine the contract language to determine whether it is ambiguous. *See Fort Vancouver Plywood Co. v. U.S.*, 860 F.2d 409, 414 (Fed.Cir.1988) (conducting analysis of contract language to determine whether language is ambiguous). Contract interpretation begins with the plain language of the agreement. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). Courts should read contract provisions to " 'effectuate [the] spirit and purpose' " of the entire contract such that " 'an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.' " *See id.* (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). Contract language is ambiguous if it is susceptible to two different interpretations, each of which is consistent with the language of the contract. *See Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993). If a term is unambiguous, the court may not give it another meaning, regardless of how reasonable it may appear to do so. *See Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir.1997).

### C. Insulation of the Heat Pumps

▓▓ The parties dispute whether the language of the contract required insulation of the heat pumps in the plumbing system of the SSPF. Section 15260, entitled "PIPE INSULATION," ¶ 1.1, "Work Included," provided that it is the contractor's responsibility to, *"Furnish all labor, equipment and materials required to install insulation to piping, pumps, heat exchangers, drains and all miscellaneous items not specifically indicated or specified to be furnished and installed under another section in the specification package."* Def.'s Motion at A37 (emphasis added).

Section 15260 ¶ 1.3, entitled "Surfaces to Be Insulated," included, *inter alia*, the "heating water system", the "chilled water piping", and the *"chilled water and heat[ed]water equipment." Id.* at A38 (emphasis added). Paragraph 1.3.5, entitled "Chilled–Water and Heat[ed]-Water Equipment," provided, "Insulation shall be cellular elastomer (Type T–9). The thickness shall be 1 inch. All surfaces subject to condensation shall be covered, and a vapor-barrier coating shall be supplied. *Equipment shall include pumps, expansion tanks, and air eliminators." Id.* at A39 (emphasis added). Thus, heat pumps were a part of the heated-water equipment. Finally, ¶ 3.1.5, entitled "Type T–9, Cellular Elastomer," specified that "T–9" insulation shall be cemented to all applicable surfaces and stated that "[p]umps shall be insulated in a manner that will permit insulation to be removed to repair or replace pumps." *Id.* at A46.

The point of contention between the parties is the meaning of the language "all surfaces subject to condensation shall be covered" in ¶ 1.3.5. Metric, in its complaint, alleged that this language meant that *only* equipment subject to condensation shall be covered. Pl.'s Response at 5–6. Metric maintained that because the heat pumps were not subject to condensation, insulation of the heat pumps was not required under the contract. *Id.* The government argues that the language was included to assure that surfaces subject to condensation were covered but did not limit insulation only to surfaces subject to condensation. Def.'s Motion at 16–17.

Metric's interpretation would render inexplicable the language in ¶ 1.3.5, "Chilled–Water *and* Heat[ed]-Water Equipment." According to ¶ 1.3, "Surfaces to Be Insulated," all of the chilled-water and heated-water equipment required insulation. According to ¶ 1.3.5, the chilled-water and heated-water equipment included pumps. According to Metric's interpretation, none of the heated-water equipment would have required insulation because none of the heated-water equipment was subject to condensation. This interpretation would also mean that all of the heating system, all of the cooling system,[12] and all of the chilled-water equipment would have required insulation in accordance with ¶ 1.3, yet the heated-water equipment would not have. Because an interpretation that required insulation of the heat pumps gives a reasonable meaning to ¶ 1.3.5 and because a contrary interpretation would achieve an inexplicable result with regard to the language of ¶ ¶ 1.1, 1.3, and 3.1.5, the court finds that the contract required insulation of the heat pumps.[13] *See Gould,* 935 F.2d at 1274.

For the foregoing reasons, the government's motion for summary judgment on the heat pump issue is granted and Metric's cross-motion is denied.

### D. Insulation of the Flexible Ductwork

Metric also claims, in its cross-motion, that the contract did not require insulation of the flexible ductwork. Pl.'s Response at 10. The government claims that it is entitled to summary judgment because the contract did require insulation of the flexible ductwork. Defendant's Response ("Def.'s Response") at 7. Metric's contention, that the contract did not require Metric to insulate the flexible ductwork, is one of pure contract interpretation and is appropriate for decision by this court. *See Gentex,* 69 F.3d at 530.

In addition to the general analysis that the court must undertake when interpreting contracts, another level of analysis is required when the court finds an ambiguity in a contract. When an ambiguity is found within a contract, the court inquires whether that ambiguity is patent. *See Fort Vancouver,* 860 F.2d at 414. "The doctrine of patent ambiguity is an exception to the general rule of contra proferentem which requires that a contract be construed against the party who wrote it. If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid." *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982); *see also Wickham Contracting Co. v. United States,* 212 Ct.Cl. 318, 546 F.2d 395, 398 (1976); *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 546 F.2d 367, 369 (1976); *Space Corp. v. United States,* 200 Ct.Cl. 1, 470 F.2d 536, 539 (1972).

12. The heated-water system and the chilled-water system only included piping and associated fixtures such as valves and were therefore different systems from the heated-water and chilled-water equipment that included pumps, expansion tanks and air eliminators. Def.'s Motion at A38–39.

13. Any cost difference between the cellular elastomer insulation originally required under the contract and the insulation recommended by Metric in its deviation/waiver was either nominal or was foregone by Metric. The deviation/waiver executed by Metric and the CO specified that Metric would use the same cloth fiberglass insulation that was used on the adjacent pipe to insulate the heat pumps instead of using the cellular elastomer insulation. Def.'s Motion at A90. The deviation was approved by the CO with no cost concession to the government. *Id.* The deviation was later incorporated into the contract at no cost to either Metric or to NASA by "AMENDMENT OF SOLICITATION/MODIFI-

CATION OF CONTRACT" No. 1455 that included a release providing:

It is further agreed that the adjustments agreed to herein constitute an accord and satisfaction and fully satisfy all claims against the Government arising out of or related to the changes specified in this Supplemental Agreement No. 1455 including, but not limited to, claims for additional costs associated with delays, disruptions, extended overhead or time impact, except as specifically provided above.

*Id.* at A83. Such an accord is enforceable by the government. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387 (Fed.Cir.1987). Metric never made any mention of an exception to the accord, with regard to the cost of the materials prior to, or after, signing the amendment. Metric, therefore, may not now claim an exception to the accord with regard to additional cost. *See Mingus,* 812 F.2d at 1394; *Progressive Bros. Constr. Co. v. United States,* 16 Cl.Ct. 549, 553 (1989).

Patent ambiguities are " 'so glaring as to raise a duty to inquire' " by the contractor. *Fort Vancouver*, 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987)). Actual knowledge of the ambiguity by the contractor is not required. The test is whether the inconsistency is obvious. *See Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, 1044–45 (1972); *see also Maintenance Eng'rs, Inc. v. United States*, 21 Cl.Ct. 553, 560 (1990) ("[a] contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry").

■ The court must place the ambiguity in the contract along a spectrum of ambiguity. *See Fort Vancouver*, 860 F.2d at 414 (citing *Newsom*, 676 F.2d at 650). Along the spectrum "there is a grey area between the point ... at which a document requires more exacting language and that at which additional detail will add nothing but worthless surplusage." *Id.* at 414. If the ambiguity falls within this grey area it cannot be patently ambiguous and the language of the contract is construed against the drafter. *Id.* The court must then determine whether the contractor's interpretation was reasonable based on the language of the contract. *See Newsom*, 676 F.2d at 650.

■ Section 15258 ¶ 1.3 of the contract, entitled "Surfaces To Be Insulated," stated that the outside air and supply air ductwork in exposed locations, wherein flexible ductwork was used, required type "T–13" insulation. Def.'s Motion at A30. Section 15258 ¶ 3.1.2, "Type T–13, Rigid Fiber Glass With Jacket," provided in pertinent part, "[s]heet metal shall be covered with rectangular rigid fiber glass insulation with factory-applied vapor barrier and finished with field-applied glass-cloth jacket." *Id.* at A33. The foregoing language from ¶ 3.1.2 makes it clear that the "T–13" insulation was designed for sheet metal surfaces.

Section 15841 entitled "LOW PRESSURE DUCTWORK/HUMIDIFIERS," ¶ 2.4, "Flexible Duct Materials," provided the specifications for the flexible ductwork. It provided in pertinent part, "[w]ire-reinforced *fibrous-glass duct* shall consist of a minimum 1–pound–density fibrous glass bonded to and supported by corrosion-protected spring helix.... Thermal conductivity shall be not greater than 0.23 at 75 degrees F mean." *Id.* at A59 (emphasis added).

Section 15841 ¶ 2.8, "Flexible Connectors for Sheet Metal," provided further specifications for the flexible ductwork. It provided in part, "[c]onnectors shall be UL-listed, 20–ounce, fire-retardant, airtight, woven *fibrous-glass cloth* impregnated with chloroprene." *Id.* at A61 (emphasis added). Section 15841 ¶ ¶ 2.4 and 2.8 require the flexible ductwork to be made of a fiber glass material, not sheet metal.

Sections 15258 and 15841 of the contract create an ambiguity as to whether insulation of the flexible ductwork was required under the contract. Section 15841 ¶ ¶ 2.4 and 2.8 specified that the flexible ductwork be made of a fiber-glass material. However, according to the language of section 15258 ¶ 3.1.2, *the required insulation for all outside air and supply air ductwork in exposed locations*, "Type T–13," was designed for sheet metal. An ambiguity exists because, while insulation of all of the outside air and supply air ductwork in exposed locations was required by the contract, the flexible ductwork was not made of sheet metal. In addition, the flexible ductwork was required by section 15841 ¶ ¶ 2.4 and 2.8 to have its own thermal conductivity rating, which suggests that it might have been acceptable without insulation. This inference is further supported by the statement in the final decision issued by the CO on the flexible ductwork that "[t]he flex connector flexible membrane is not sheet metal material; therefore, the rigid board type insulation would not be acceptable.... The Government does agree that insulation of the flexible connectors might not be technically necessary if the Contractor had ... installed flexible connectors meeting the thermal conductivity requirements of the contract." *Id.* at A122–23.

Because there is an ambiguity in the language of the contract, we inquire whether the ambiguity is patent or whether the ambiguity fell within the grey area between the point "at which a document requires more exacting language and that at which addition-

al detail will add nothing but worthless surplusage." *See Fort Vancouver*, 860 F.2d at 414.

The specifications requiring insulation of the ductwork in general and the section specifying the technical requirements of the flexible ductwork were in entirely separate parts of the contract and thus would not have been immediately associated with each other. The contract neither explicitly stated that the flexible ductwork required insulation, nor did it make reference to the flexible ductwork in the section specifying the requirements of the "T–13" insulation. The specifications for the flexible ductwork included a thermal conductivity factor, suggesting that insulation was not required to prevent the condensation problem that the insulation was ultimately required to correct.[14] Considering all of these factors, we find that the contract could have been construed not to require insulation of the flexible ductwork without alerting the contractor to the ambiguity. The ambiguity in the contract was not "so glaring as to raise a duty to inquire" by the contractor and thus falls short of a patent ambiguity. *See Newsom*, 676 F.2d at 650 (citing *Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 425 F.2d 1260, 1263 (1970)).

■ In the absence of a patent ambiguity, we examine whether Metric's interpretation of the contract was reasonable. Because the general ductwork insulation requirements and the requirements for the use of flexible ductwork were specified in separate sections of the contract, and because the flexible ductwork had to meet its own thermal conductivity rating, the court finds that it was reasonable for Metric to make the assumption that insulation was not required on the flexible ductwork. It was also reasonable for Metric to assume that the language that required rigid "T–13" insulation for sheet metal surfaces did not apply to flexible fiberglass ductwork that had a thermal conductivity rating of its own. The reasonableness of these assumptions is supported by the CO's statement in her decision that the

flexible ductwork was not sheet metal and thus would not require rigid insulation and that insulation of the flexible ductwork might not have been technically necessary if the contractor had met the thermal conductivity requirements of the contract. Def.'s Motion at A122–23.

The reasonableness of Metric's assumption about the flexible ductwork insulation places the burden of the ambiguity upon the drafting party under the principle of contra proferentem. *See Triax*, 130 F.3d at 1474. Because the court finds that the contract could reasonably be interpreted not to require insulation of the flexible ductwork, the government's motion for summary judgment is denied.

■ Metric's cross-motion is defeated because of an unresolved factual issue regarding Metric's failure to install flexible ductwork that met the thermal conductivity requirements of section 15841 ¶¶ 2.4 and 2.8. The CO stated in her decision on Metric's claim that Metric's failure to use a flexible duct that met the thermal conductivity requirements of the contract resulted in condensation on the flexible ductwork that Metric corrected by installing insulation. Def.'s Motion at A123. While insulation of the flexible ductwork was not unambiguously required under the language of the contract, so that the CO could not insist on its installation, the CO did have the right under the contract to insist upon strict adherence to the specifications regarding the thermal conductivity of the flexible ductwork. *See Granite Constr. Co. v. United States*, 962 F.2d 998, 1006–07 (Fed.Cir.1992). The record reflects that the CO did not require strict adherence to the contract, but instead required Metric to insulate to correct the condensation problem that resulted from its use of non-conforming flexible ductwork. When requiring compliance with the specifications of a contract, the CO does have some discretion to improvise the method for correcting defective work. Strict adherence to contract specifications is not the only alter-

14. Insulation was ultimately required on the flexible ductwork because Metric failed to install ductwork that met the thermal conductivity requirements of the contract. Def.'s Motion at

A123. The problems that this failure creates with regard to the pending motions are discussed below.

native. *See Stamell Constr. Co.,* DOTCAB No. 68–27I, 75–1 B.C.A. (CCH) ¶ 11,087 at 52,792; *Mishara Constr. Co.,* ASBCA No. 17957, 75–1 B.C.A. (CCH) ¶ 11,206 at 53,354; *COAC, Inc.,* IBCA No. 1004–9–73, 74–2 B.C.A. (CCH) ¶ 10,982 at 52,265. The method of repair chosen by the CO, however, must be reasonable with respect to the original specifications and costs of the contract. *See Stamell Constr. Co.,* at 52,792; *Mishara Constr. Co.,* at 53,354. In *Stamell,* for instance, the Board found that the proposed method of repair suggested by the CO was reasonable because it was no more costly than what was required by the specifications of the contract. *See Stamell Constr. Co. supra.*

■ The record does not reveal whether the instruction to insulate was a reasonable solution to the thermal conductivity problem. The court cannot determine whether the CO's instruction to insulate was reasonable without knowing, for example, whether insulating imposed greater costs on Metric than removing and replacing the non-conforming flexible ductwork. Because Metric failed to meet the specifications of the contract, and because the CO had the right to demand correction of the failed specifications—but only on reasonable terms—there remains an issue of material fact that precludes entry of judgment in favor of Metric's cross-motion.

IV. Conclusion

For the reasons stated above, the government's motion for summary judgment is GRANTED with respect to the heat pump issue. Metric's motion for summary judgment is denied with respect to that issue. Both the government's motion and Metric's cross-motion for summary judgment are DENIED with respect to the insulation of the flexible ductwork. Metric's claim, to the extent that it is based on a claim of defective specifications, is DISMISSED for want of jurisdiction.

IT IS SO ORDERED.